135 F.Supp.2d 480 (2001)
In re RELIANCE SECURITIES LITIGATION
William Eric Graham, et al., on behalf of themselves and all others similarly situated, Plaintiffs,
v.
Taylor Capital Group, Inc. f/k/a Cole Taylor Financial Group, Inc., Cole Taylor Bank, Jeffrey W. Taylor, Bruce W. Taylor, Sidney J. Taylor, Lori Cole, Shirley Cole, Cathy Cole Williams, Thomas L. Barlow, Howard B. Silverman, James D. Dolph, J. Christopher Alstrin, Michael Bernick, William S. Race, Ross J. Mangano, Solway F. Firestone, Melvin E. Pearl, Dean L. Griffith, KPMG Peat Marwick, LLP, ABN Amro Inc. f/k/a The Chicago Corp., and Sandler O'Neill Corporate Strategies, Defendants.
No. MDL 1304. No. Civ.A. 99-858-RRM.
United States District Court, D. Delaware.
March 29, 2001.
*481 *482 *483 *484 *485 R. Bruce McNew, Taylor & McNew, LLP, Greenville, DE, Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Helen J. Hodges, Jeffrey D. Light, Karen L. Thomas, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, David B. Kahn, Mark E. King, David B. Kahn & Associates, Ltd., Northfield, IL, Robert F. Coleman, Robert F. Coleman & Associates, Richard Bemporad, Richard Dannenberg, Michelle Rago, Lowey Dannenberg Bemporad & Selinger, PC, White Plains, NY, Daniel Zazove, Barbara Young, Field & Golan, Chicago, IL, for plaintiffs.
James L. Holzman, Bruce E. Jameson, Prickett, Jones & Elliott, Wilmington, DE, Steven P. Handler, Steve Hoeft, David S. Rosenbloom, McDermott, Will & Emery, Chicago, IL, for defendants J. Christopher Alstrin, Jeffrey W. Taylor, Bruce W. Taylor, Sidney J. Taylor, Taylor Capital Group and Cole Taylor Bank.
R. Franklin Balotti, Lisa A. Schmidt, Peter B. Ladig, Richards, Layton & Finger, Wilmington, DE, Thomas I. Matyas, Richard M. Hoffman, Michael A. Kaeding, Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendants Irwin Cole, Lori Cole, Shirley Cole, Cathy Cole Williams.
Arthur L. Dent, Potter Anderson & Corroon, LLP, Wilmington, DE, David Kristenbroker, Joseph Fogel, Leah J. Domitrovic, Theresa L. Davis, Freeborn & Peters, Chicago, IL, for defendant Melvin E. Pearl.
William H. Sudell, Jr., Martin P. Tully, Morris, Nichols, Arhst & Tunnell, Wilmington, DE, Timothy W. Mountz, Baker & Botts L.L.P., Dallas, TX, David D. Sterling, Baker & Botts L.L.P., Houston, TX, James R. Figliulo, Figliulo & Silverman, P.C., Chicago, IL, for defendant KPMG Peat Marwick LLP.
Francis J. Murphy, Murphy Spadaro & Landon, Wilmington, DE, Bruce R. Meckler, James H. Kallianis, Jr., Christopher E. Kentra, Meckler, Bulger & Tilson, Chicago, IL, for defendant Thomas L. Barlow.
Henry E. Gallagher, Jr., Connolly Bove Lodge & Hutz LLP, Wilmington, DE, John W. Rotunno, Stephen J. O'Neil, Sarah K. Johnson, Bell, Boyd & Lloyd LLC, Chicago, IL, for defendants Solway F. Firestone, Dean L. Griffith, Ross J. Mangano, William S. Race.
Richard D. Kirk, Morris, James, Hitchens & Williams LLP, Wilmington, DE, Steven R. Smith, Richard T. Greenberg, William F. Zieske, Ross & Hardies, Chicago, IL, for defendant Howard B. Silverman.
George W. Spellmire, John C. Everhardus, Jonathan S. Goodman, D'Ancona & Pflaum LLC, Chicago, IL, for James D. Dolph.
Michael D. DeBaecke, Blank Rome Comisky & McCauley, LLP, Wilmington, DE, Alton B. Harris, Steven M. Malina, Robert *486 H. Griffith, Ungaretti & Harris, Chicago, IL, for defendant ABN AMRO Inc., as successor to The Chicago Corporation.
Lawrence C. Ashby, Ashby & Geddes, Wilmington, DE, John L. Hardiman, William L. Farris, Kieran B. Morrow, Sullivan & Cromwell, New York City, for defendants Sandler O'Neill Corporate Strategies, Sandler O'Neill & Partners L.P.

OPINION
McKELVIE, District Judge.
This is a securities class action. The dispute arises from the corporate restructuring and subsequent bankruptcy of the Cole Taylor Financial Group ("CTFG") in 1997 and 1998.
In 1981, Irwin Cole and Sidney Taylor formed CTFG as a holding company for a group of commercial banking institutions. It remained a private corporation until 1994 when the company made an initial public offering of its stock. In 1997, at the time of the corporate restructuring, CTFG operated as a holding company for three wholly owned subsidiaries: Cole Taylor Bank, a commercial bank based in Chicago, Illinois; Reliance Acceptance Corporation ("RAC"), a finance company specializing in subprime auto loans based in San Antonio, Texas; and CT Mortgage Company, Inc., a mortgage company that provided subprime residential real estate loans.
On February 12, 1997, after a vote of the shareholders, CTFG spun off Cole Taylor Bank and CT Mortgage Company and retained control of RAC.[1] On February 9, 1998, less than a year later, CTFG filed for bankruptcy protection in Delaware.
In early 1998, shareholders of CTFG filed a number of class action lawsuits in the Western District of Texas, the Northern District of Illinois, and Delaware Chancery Court against officers, directors, accountants, financial advisors, subsidiaries of CTFG, and other entities formed in the split-off transaction, alleging violations of ง 10(b), ง 14(a), and ง 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. งง 78j(b), 78n(a), and 78t(a), as well as various state law claims.
On September 4, 1998, David Allen, the estate representative of the chapter 11 estate of CTFG and its subsidiaries, filed two adversary bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware asserting state law fraudulent transfer claims, fiduciary duty claims, professional malpractice claims, and related common law claims against many of defendants named in the Texas and Illinois lawsuits. On March 12, 1999, a number of defendants in the adversarial proceedings moved to withdraw the reference to the bankruptcy court and on June 23, 1999 moved to consolidate the cases. On July 15, 1999 the court granted the motion to consolidate and on July 22, 1999 granted the motion to withdraw the reference to bankruptcy court.
On December 9, 1999, the Judicial Panel on Multidistrict Litigation transferred the Texas and Illinois lawsuits to this court to consolidate discovery and other pre-trial matters with the adversarial proceedings in the bankruptcy.
In early 2000, defendants moved to dismiss the securities class action complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6) and ง 21D(b) of the Private Securities Litigation Reform Act, 15 U.S.C. ง 78u-4(b)(1, 2). On April 19, 2000, this court denied defendants' motions to dismiss. See Graham v. Taylor Capital *487 Group, Inc. (In re Reliance Securities Litigation), 91 F.Supp.2d 706 (D.Del.2000).
Since that opinion, a number of defendants have moved separately for summary judgment. This is the court's decision on those motions.

I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the pleadings and publicly filed documents, as well as the depositions, affidavits, and answers to interrogatories filed by the parties in support of their motions. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is a genuine issue as to a material fact "if a reasonable jury could return a verdict for the nonmoving party." Id.

A. CTFG and The Subsidiaries

In the early 1980's, Irwin Cole and Sidney Taylor formed CTFG as a banking and consumer loan business. By the time of the split-off transaction, CTFG operated solely as a holding company through its wholly owned subsidiaries: Cole Taylor Bank, Reliance Acceptance Corporation, and CT Mortgage Company, Inc. In 1994, CTFG made an initial public offering of its stock. The Cole and Taylor families remained the largest shareholders, each retaining 25% of the outstanding shares.
Cole Taylor Bank is a commercial bank, based in Chicago, with a record of sustained profitability, but slow growth. Irwin Cole and Sidney Taylor purchased Cole Taylor Bank in 1969 as Main State Bank. In 1978, Irwin Cole and Sidney Taylor purchased Drovers National Bank and in 1984, CTFG became the holding company for the two banks. By 1992, CTFG had purchased four additional suburban Illinois banks and merged all of the individual institutions into Cole Taylor Bank. In 1997, the bank operated through ten branch offices and provided a full range of commercial and consumer banking services to individuals and companies around Chicago, Illinois.
In 1992, CTFG incorporated Reliance Acceptance Corp. as a wholly owned subsidiary. RAC commenced operations in January 1993. It purchased and serviced sales finance contracts in connection with the sale of automobiles. Principally, RAC purchased subprime loans, loans in which the borrowers had substandard or nonexistent credit histories. RAC bought the loans at a discount from the car dealers. On September 30, 1996, the Finance Company operated through 47 branch offices in 16 states and had approximately 400 full time employees.
CT Mortgage Company was formed in 1995. It provided residential loans in the subprime market.
CTFG's board took affirmative steps to provide oversight of the financial reports of the subsidiary companies. CTFG had an Internal Audit Department that examined the policies and procedures in place at CTFG and its subsidiaries. This department produced periodic reports on its findings. Maria Tabrizi served as the head of CTFG's Internal Audit Department.
CTFG also established an Audit and Examining Committee, which consisted of three outside directors. Tabrizi served as the committee's secretary. The committee's charter states that it "is responsible *488 to the Board of Directors to ensure that the financial reports of the Corporation and its subsidiaries are prepared and reviewed with sufficient competence as to give every reasonable assurance that they accurately reflect the results of the business conducted." The committee was to meet no less than semiannually with financial management, and annually with outside auditors to review financial reports prior to their release.
The Taylor family, co-founder Sidney Taylor and his sons Jeffrey and Bruce Taylor, managed the day-to-day operations of CTFG and helped govern the subsidiaries. Sidney Taylor served as a director and the chairman of the board's Executive Committee. He also served as a director for both the bank and the auto loan subsidiary.
Jeffrey Taylor served as the chairman of CTFG's Board of Directors, a member of the board's Executive Committee, and the chief executive officer of CTFG. He also served as the chairman of the bank and as a director of the auto loan subsidiary.
Bruce Taylor served as president of CTFG and as a member of the board's Executive Committee. He also served as the president and chief executive officer of Cole Taylor Bank and as a director and chief executive officer of the auto loan subsidiary.
While less active in the day-to-day operations of CTFG, members of the Cole family also participated in the governance of the company and the auto loan subsidiary. Co-founder Irwin Cole served as a director and vice chairman of the Executive Committee of CTFG and a director and vice chairman of the board of the subprime lender. Irwin's daughter, Lori Cole, was a director of both CTFG and RAC prior to the corporate restructuring.
Thomas Barlow served as the president, chief executive officer and a director of CTFG after the split-off from February 1997 through May 6, 1997. Prior to that he served as president, chief executive officer, and as a director of RAC.
Melvin Pearl joined CTFG's Board of Directors in 1984. He served on the board of RAC from 1994 to 1996. After the reorganization, Pearl left positions at CTFG and at RAC, and became a director of Cole Taylor Bank.
Howard Silverman was a director of CTFG and the chairman of the Board of Directors of RAC from its inception.
Solway Firestone is a certified public accountant. He served on CTFG's Board of Directors and on the Audit and Examining Committee before the restructuring. After the split-off, Firestone served as chairman of the Audit and Examining Committee and as a member of the newly formed Financial Oversight Committee.
Dean Griffith became a director of CTFG in 1989. He served on CTFG's Audit and Examining Committee from 1995 until the reorganization.
Ross Mangano became a director of CTFG in 1993. He served as a member of the Audit and Examining Committee until the split-off and thereafter as a member of the Financial Oversight Committee.
William Race served as chief financial officer of CTFG from 1990 until August 31, 1995. From August 31, 1995 until December 31, 1995, Race served as an executive vice president at CTFG. Race also served as a director of CTFG and after the split-off as a member of the Audit and Examining Committee and the chairman of the Financial Oversight Committee.
Christopher Alstrin replaced Race as CTFG's chief financial officer on September 1, 1995. Alstrin served until the split-off transaction at which time he left CTFG *489 and became as the chief financial officer of Cole Taylor Bank.
Michael Bernick served as CTFG's treasurer until the close of the split-off transaction. He then served as CTFG's chief financial officer until March 13, 1997.
James Dolph replaced Bernick as chief financial officer of CTFG after the close of the split-off transaction on March 13, 1997.

B. RAC's Business

RAC purchased and serviced subprime automobile loans from automobile dealers. RAC purchased these loans directly from automobile dealerships at a price discounted from the loan's face value. RAC funded its activities through a combination of bank debt, advances from CTFG, and commercial paper. RAC had a $150 million secured revolving line of credit with a consortium of financial institutions. The line was structured to allow RAC to draw under the facility or to issue commercial paper.
Beginning in 1994, RAC reported record net income gains in every reporting period through and including the third quarter of 1996. Plaintiffs contend this income growth rate came as a result of two corresponding actions, RAC taking on ever-riskier loans and RAC's failure to increase its loan loss reserves. Plaintiffs contend that RAC did not properly estimate the amount of its portfolio that would be recovered and failed to provide an adequate loan loss reserve on their balance sheet. Thus, according to plaintiffs, RAC and CTFG overstated their income for the years 1993-1996. Because loan portfolios and loss reserves are integral to this opinion, the court sets out a general description of these accounting principles.
Under generally accepted accounting principles ("GAAP"), a company is required to recognize all losses that are probable and can be reasonably estimated as of the date of its financial statements. Thus, RAC's management was required to estimate the amount of its loan portfolio on which a probable loss had been incurred as of the date of the financial statements. A finance company classifies a loan as a loss when it has become impaired, that is, when the company reasonably believes that the borrower will stop paying the loan according to its terms, and when the borrower actually stops payment. Thus, RAC had to estimate periodically which loans were impaired and the total amount that it could recover on impaired loans. A finance company cannot report the value of a loan portfolio on a balance sheet at a number greater than the estimated collectible portion of the loans. In other words, if a loan portfolio has a face value of $100 million, but is only 75 percent collectible, a finance company may not report the portfolio at more than $75 million.
Under GAAP, a company should establish sufficient loan reserves to cover the amount of its probable losses that have occurred and can be reasonably estimated. "The reserve is established by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve." Shapiro v. UJB Fin. Corp., 964 F.2d 272 (3d Cir.1992) (quoting American Bankers Association, Banking Terminology 215 (1989)). The American Institute of Certified Public Accountants's Audit and Accounting Guide โ Audits of Finance Companies ง 2.04 states:
A finance company should maintain a reasonable allowance for credit losses applicable to all categories of receivables through periodic charges to operating expenses. The amount of the provision can be considered reasonable when the allowance for credit losses, including the current provision, is adequate to cover *490 estimated losses in the receivable portfolio.
RAC included its reserves in its financial statements as part of the non-refundable dealer discount, that is, the difference between the loan's face value and the amount RAC paid to the dealer for the loan. (For example, if a loan had a face amount of $10,000 and RAC paid $9,000 for the loan, the $1,000 difference is the non-refundable dealer discount.) RAC charged losses from uncollectible loans against its loss reserves.
Because RAC's portfolio consisted of thousands of homogeneous and relatively small loans, RAC could not know which of these loans were impaired or the amount of the resulting impairment. As opposed to some lending institutions that can set loss reserves by analyzing each of the loans in a portfolio, RAC had to make accounting estimates to set its reserve rates.

C. RAC's Growth and the Split-off Transaction

From its inception in 1993, RAC grew rapidly. Each fall the Federal Reserve Bank would review the overall financial condition of CTFG and each of its subsidiaries. On November 7, 1994, the Federal Reserve Bank issued its Combined Report of Inspection and Examination of Cole Taylor Financial Group for the period ending June 30, 1994. The report noted that RAC "was profitable in its seventh month of operation" and that "[e]arnings significantly exceeded the budget." The report further noted, in a section titled "Future Prospects," "while representing a small fraction of total consolidated holding company assets, [RAC] has become a substantial contributor to corporate profitability."
RAC's growth fueled CTFG's financial expansion. On March 14, 1995, CTFG issued its 1994 Annual Report. In a letter accompanying the report, Jeffrey and Bruce Taylor wrote, "[Cole Taylor Financial Group] continued its transformation into a truly diversified financial service company in 1994. Our finance subsidiary contributed significantly to earnings in only its second year." Further, the letter stated that RAC "achieved tremendous growth in its second year in operation, reporting net income of $4.3 million in 1994, up from $198,000 in 1993." The annual report noted, "[RAC] has achieved this impressive level of success by adhering to its fundamentals: hiring experienced managers; consistently applying its high underwriting standards; and responding quickly to clients' needs." Along with these claims, the Annual Report noted the importance of maintaining "disciplined adherence to underwriting standards" in the subprime market.
KPMG audited the consolidated balance sheet and consolidated statements of income for CTFG and its wholly owned subsidiaries for the years 1994, 1995, and 1996. KPMG issued audit reports in each of these years. According to plaintiffs, the January 24, 1995 report, which is representative of the other reports, stated:
We have audited the accompanying consolidated balance sheet of Cole Taylor Financial Group and its wholly owned subsidiaries ("the Company") as of December 31, 1994, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the year then ended ....
We conducted our audit in accordance with generally accepted auditing standards. ... We believe that our audit provides a reasonable basis for our opinion.
In our opinion, the 1994 consolidated financial statements referred to above present fairly, in all material respects, the financial position of Cole Taylor Financial *491 Group, Inc. and its wholly owned subsidiaries as of December 31, 1994, and the results of their operations and their cash flow for the year then ended in conformity with generally accepted accounting principles.
On March 29, 1995, CTFG filed its 1994 Form 10-K with the Securities Exchange Commission. This document was signed by defendants Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Race, Irwin Cole, Race, Firestone, Griffith, Mangano, and Silverman. The Form 10-K reported a fourth straight year of record earnings and income for CTFG and its subprime finance subsidiary. The Form 10-K documented RAC's increase in gross receivables from $24.4 million at year-end 1993 to $126.7 million at year-end 1994. RAC reported a loan loss reserve of $5.35 million for 1994. In the Form 10-K, CTFG noted:
The allowance [for loan losses] is maintained by management at a level considered adequate to cover losses that are currently anticipated based on past loss experience, general economic conditions, information about specific borrower situations ... and other factors and estimates which are subject to change over time.... These estimates are reviewed periodically and, as adjustments become necessary, they are reported in income through the provision for loan losses in the periods in which they become known. The adequacy of the allowance for loan losses is monitored by the internal loan review staff and reported to management and the Board of Directors.
The plaintiffs contend that despite this statement, RAC did not maintain appropriate levels of loan loss reserves and therefore materially overstated RAC's and CTFG's income.
In the Forms 10-Q filed throughout 1995, CTFG continued to document RAC's growth. In the first quarter, RAC's net income grew from $369,000 to $1.7 million. Gross finance receivables increased from $42 million at the end of the first quarter of 1994 to $155 million a year later. In the second quarter of 1995, RAC's net income grew from $660,000 at the end of the second quarter in 1994 to $2.1 million at quarter's end 1995, gross finance receivables grew from $65 million to $202.1 million over the same period. In the third quarter, RAC's net income grew from $1.5 million at the end of the third quarter in 1994 to $2.7 million in 1995, gross receivables increased from $96.6 million at quarter's end to $256.4 million.
In 1995, CTFG officers and directors touted the strength of RAC's loan portfolio. On June 21, 1995, CTFG issued a press release quoting William S. Race, CTFG's chief financial officer, as stating "`we have been able to maintain both margins and the high quality of receivables.'" On the same date, plaintiffs allege, Bruce Taylor made a presentation to institutional investors, portfolio managers, analysts, and brokers. According to plaintiffs, Taylor stated that he expected RAC to continue to achieve strong growth, that RAC adhered to strict underwriting practices, and RAC had strict procedures in place to assure that it maintained a high quality loan portfolio.
Despite CTFG's and RAC's success, substantial disagreements developed between the Cole family and the Taylor Family regarding the strategic direction of the company. The Cole family proposed a number of transactions for restructuring the company that the Taylor Family resisted. The Cole family, at its own expense, engaged Sandler O'Neill Corporate Strategies to evaluate the options. In August 1995, a special committee of CTFG's directors determined that the dispute between the Coles and the Taylors was disrupting *492 the management and performance of the company.
On August 3, 1995, the Audit and Examining Committee discussed a summary of the audit reviews of RAC's branch reports for the period April 1, 1995 through June 30, 1995. The audit report states that 37% of the branch reports had incomplete or inaccurate credit investigations or verifications, 26% of the branch reports demonstrated that the branch had exceeded its loan cap/approval authority, and 15% of the branch reports reflect that the branch had shown poor loan judgment. In a category called, "Other Deficiencies," the audit report states that 48% of the branch reports demonstrated that the branches are in noncompliance with RAC collection procedures, 37% of the branches were poorly organized, and 33% of the branches gave inadequate training to its employees. According to the minutes, Firestone, Griffith, and Mangano, attended the committee meeting. Plaintiffs contend that committee members passed information discussed at the Audit and Examining Committee meetings to the rest of the board.
In September 1995, CTFG's Board of Directors voted to retain the Chicago Corp. (subsequently renamed ABN AMRO, Inc.), which had a long-standing relationship with CTFG, to provide advice regarding the company's strategic options for corporate restructuring.
On November 2, 1995, the Audit and Examining Committee again discussed issues related to RAC's branch offices. According to the meeting minutes, the committee reviewed the Corporate Level Audit Report. Plaintiffs contend that the report disclosed that 62% of the branch reports contained inaccurate or incomplete credit investigations, 54% of the branch reports reflected that funding deposits were not met, and 62% of the branch reports disclosed inaccurate or incomplete repossession records.
On November 3, 1995, CTFG publicly announced the retention of Sandler O'Neill and ABN AMRO (collectively, the "Financial Advisors") to identify potential candidates to acquire all or part of CTFG. As part of their engagement contracts, ABN AMRO and Sandler O'Neill agreed to provide opinions about whether a proposed acquisition or combination was fair to CTFG. Both agreements contained clauses permitting CTFG to publish the Financial Advisor's opinions in a proxy statement in connection with any transaction.
On November 6, 1995, the Federal Reserve Bank of Chicago issued its Report of Inspection and Examination of Cole Taylor Financial Group for the period ending June 30, 1995. According to plaintiffs each of the directors and officers of CTFG received a copy of this report. The cover letter accompanying the report states: "The overall financial condition of the organization is considered satisfactory.... However, the liquidity position of the bank and the funding practices of the nonbank subsidiary [RAC] are two areas which need to be addressed by management."
Although the report gave RAC a satisfactory overall rating, the Federal Reserve Board disclosed that RAC's asset quality was "deteriorating." The report stated:
A significant portion of [RAC's] portfolio is not considered seasoned and the deterioration is expected to continue as bad credits continue to surface with the seasoning of the portfolio. As of June 30, 1995, past due receivables represented 1.3% of gross receivables, a significant increase compared to 0.6% a year ago. As of June 30, 1995, repossessions represent 1.3%, compared to 0.8% for June 30, 1994, also indicating a substantial increase.... The increase is largely attributed to the continued seasoning of *493 the portfolio. Despite the increase, management believes that [RAC's] delinquencies and repossessions compare favorably to the industry.... [RAC's] management is comfortable that the dealer loss reserve of 5.7% of contract receivables is adequate protection for future losses. However, given the rising delinquencies and repossessions, and the high proportion of unseasoned credits, management is urged to review the adequacy of the dealer loss reserve to absorb potential losses. Failure to maintain an adequate loan loss reserve may leave earnings subject to greater fluctuations should losses continue to rise.
The report went on to warn, "it is critical that [RAC] maintain sound underwriting policies and procedures, given that customers have unfavorable credit histories and that the credits ... entail significant risks of default and may increase collection expense." Further, the author noted, "[s]uccess in the sub-prime market relies largely on strict credit discipline, experienced senior officers and branch managers, a low cost, ... operation and an effective collection effort."
On January 30, 1996, CTFG issued a press release again reporting record net earnings. CTFG's net income increased from $17.8 million in 1994 to $23.7 million at year end 1995. RAC's year end net income grew from $4.3 million in 1994 to $9.6 in 1995. RAC's gross receivables grew from $126.7 million in 1994 to $315.9 million in 1995.
In light of the disagreements between the Coles and the Taylors, on January 31, 1996, the Taylor Family proposed a split-off transaction in which, immediately after the transfer of certain automobile loan assets and cash from Cole Taylor Bank to another subsidiary of CTFG, the Taylor Family would exchange its existing shares of common stock in CTFG, as well as certain additional shares of common stock, for all of the outstanding common stock of the bank. The Coles resisted this proposal.
On April 1, 1996, CTFG filed its 1995 Form 10-K. The 1995 Form 10-K made the same assurances regarding the loan loss reserves as the 1994 Form 10-K. The company noted that the allowance for loan loss reserves was "adequate" and adjusted as the necessary. In 1995, RAC recorded a $12.7 million loan loss reserve.
On April 19, 1996, the Taylor family submitted an improved written split-off proposal to the board, increasing the number of shares of CTFG's common stock that would be exchanged for bank stock, and changing the assets that would be transferred from the bank to cash and accounts receivable.
Concurrently, the Financial Advisors identified a third party interested in acquiring the Cole Taylor Bank. The CEO of the third party, however, declined to proceed with the transaction absent unanimous consent of CTFG's Board of Directors. After Jeffrey Taylor indicated to the CEO that he did not support the sale of the bank to a third party, the CEO stated to the board that he would not submit a bid on the bank as long as the Taylors' split-off transaction was under consideration.
In conjunction with the split-off transaction proposed by the Taylor Family, the Financial Advisors each reviewed the audited financial statements and other financial data for CTFG and discussed CTFG's financial status with management. The Financial Advisors told the board that the value of the consideration to be received under the Taylor Family proposal was approximately equal to the consideration discussed by the third party interested in acquiring Cole Taylor Bank. The Financial Advisors noted that the risk that the Taylor Family proposal would not be consummated *494 was greater than that of the third party's proposed acquisition, because the Taylor Family would be required to obtain a favorable tax ruling, and would need to raise additional capital. The Financial Advisors noted, however, that the Taylor proposal was not subject to due diligence.
On May 14, 1996, CTFG filed its first quarter Form 10-Q. CTFG disclosed continued growth based primarily on RAC's expansion. RAC's net income increased over the first quarter numbers of the previous year, from $1.7 million in 1995 to $3.6 million in 1996. RAC's gross finance receivables increased over the past year from $155 million to $377 million. The Form 10-Q also contained a statement regarding a change in RAC's policy for setting the loan loss reserve levels:
Effective January 1, 1996, [RAC] adopted the practice of accumulating loss data on individual pools of loans (based on the month of origination) and allocating portions of the dealer discount representing nonrefundable dealer reserves to cover such anticipated losses. To the extent [RAC] realizes loss experience by pool greater than that initially established, a loan loss reserve will be established by charges to operating expense.
According to plaintiffs, notwithstanding this new policy, RAC maintained inadequate loan loss reserves.
On June 12, 1996, the Board of Directors held a special meeting for the purpose of considering the proposed transaction with the Taylor family. On this date, the Financial Advisors each rendered a written opinion to the board. After reviewing the terms of the split-off agreement; the audited and unaudited financial statements for CTFG and its subsidiaries for 1995 and the first quarter of 1996; financial forecasts for CTFG and the subsidiaries; historical reported price and trading activity for CTFG stock, including a comparison of similar companies; the terms of other similar business combinations; current market activity; the views of management; and other material; ABN AMRO and Sandler O'Neill stated in separate opinion letters, "the Consideration to be received [by CTFG] pursuant to the Agreement is fair from a financial point of view, to the non-Taylor Family shareholders of the Company." The board approved the terms of the transaction and authorized its execution by a unanimous vote of the directors present.
On June 13, 1996, CTFG issued a press release announcing an agreement by which the Taylor family would receive Cole Taylor Bank and CT Mortgage Company from CTFG. In return the Taylor Family would give CTFG between 4 and 4.5 million shares of CTFG stock and Cole Taylor Bank would transfer between $82 and $98 million in cash and approximately $30 million in receivables. According to plaintiffs, at that time, the Taylor family owned approximately 3.7 million shares and expected to obtain the remainder from other executives who desired to participate in the transaction.
On August 14, 1996, CTFG filed its second quarter Form 10-Q. RAC's net income grew from $3.6 million to $4.1 million from the previous year. Gross finance receivables grew from $202.1 million to $316 million. In a press release issued the next day, Barlow commented that "We have a strong reserve position and we continue to monitor our static pool loss history to ensure the adequacy of our reserves."
On October 10, 1996, CTFG filed a Form 8-K, signed by then-chief financial officer Christopher Alstrin. This form contained financial statements for the years 1993 to 1995, as well as audit reports prepared by KPMG. CTFG stated in its filing that RAC's "nonrefundable dealer discount [for credit losses] is adequate to absorb possible *495 losses on credits that may become uncollectible."
CTFG invited its shareholders to vote upon the proposed split-off transaction, and disseminated a Proxy Statement, dated October 15, 1996, to its shareholders. The Proxy Statement contained in full the fairness opinions prepared by the Financial Advisors. The Proxy Statement disclosed that the members of the Cole and Taylor families, as well as the other executive officers and directors of CTFG, all intended to vote in favor of the split-off. Collectively, these individuals held approximately 55% of the outstanding stock of CTFG. Since a simple majority of the shares was necessary to approve the split-off, the Proxy Statement recited that:
The affirmative votes of the Taylor Family, the Cole Family and the other executive officers and directors of the Company will, collectively, be sufficient to approve the Share Exchange Agreement and the Split-Off Transactions and the amendment to the Company's Certificate of Incorporation to effect the Name Change, regardless of the votes of any other stockholders.
On October 16, 1996, the Federal Reserve Bank issued its annual report on the financial situation of CTFG for the period ending June 30, 1996. Although stating that "asset quality remain[ed] adequate," the report noted that the portfolio continued to mature and deteriorate stating, "as of June 30, 1996, delinquencies and repossessions represented 4.4% of net finance receivables compared with 3.8% reported at June 30, 1995." Plaintiffs contend that the problem was actually worse than reported in that the examiners did not know the true state of RAC's portfolio because RAC did not charge off a loan until it was at least six months past due. That is, according to plaintiffs, even if a loan purchased in January 1996 immediately defaulted, it would not have been charged off by June 30, 1996. Thus, plaintiffs contend given the seasoning of the portfolio, a greater number of loans should have been charged off than were reported. The Federal Reserve Bank report also noted that internal reports from CTFG rated several branches "unsatisfactory ... due to numerous exceptions created by high employee turnover over the past twelve months." However, the report observed that according to RAC management "overall employee turnover was reduced from 104% in 1995 to an annualized 74% in 1996 with a more significant decline in turnover at the manager level."
Despite these positive trends, the Federal Reserve Bank recognized that changes in RAC's accounting methodology were necessary to adequately reflect the "deficiency balances on repossessions, the direct expense rather than the capitalization of costs relating to repossessed autos, and a better methodology in determining the adequacy of the dealer discount for potential loan losses." And, although KPMG and RAC's management indicated their satisfaction with "the level of the dealer discount for each pool of receivables," the Federal Reserve Bank remained concerned. The report noted that "the adequacy of the dealer discount for the 1993 to 1995 pool is questionable." In light of the charges offs and high volume of receivables relative to the level of the dealer discount for the pool, the Federal Reserve Bank required CTFG management to "submit the monthly dealer discount analysis for the 1993 to 1995 pool to the Federal Reserve within 30 days of each month end."
On November 15, 1996, CTFG's shareholders voted in favor of the split-off transaction.
On November 18, 1996, Michael Bernick, the chief financial officer of RAC, wrote a *496 memo to Howard Silverman that stated, "there may be a loan loss provision taken in the fourth quarter, possibly a substantial amount, if the 1993-1995 static pool losses do not improve." Silverman testified at his deposition that he circulated this memo to Race, Firestone, and Mangano.
On December 23, 1996, Firestone called a special meeting of the Audit and Examining Committee. According to the minutes, the purpose of the special meeting was to ensure that the committee would follow up on the issues raised in the November 18, 1996 Bernick memo and to make sure that no action or public disclosure was necessary prior to the end of the year. In attendance at the meeting were Firestone, Mangano, Alstrin, Race, Silverman, and Jeffrey Taylor as well as representatives of KPMG.
On January 29, 1997, the press reported that Mercury Finance, a subprime automobile lender that was also founded by Silverman, had been fraudulently overstating its net income for the past several years. In the wake of this news, CTFG's stock price fell from $29 per share on January 29 to $17-3/4 on February 7, 1997.
On February 7, 1997, CTFG announced to the financial press that "[p]reparation for the split-off transaction has caused the Company to take additional time, beyond the time historically taken, to prepare and issue its 1996 financial statements." On February 12, 1997, CTFG announced the close of the transaction. Two days later, on February 14, 1997, CTFG issued a press release announcing that "it would make significant provisions for credit losses for the fourth quarter of 1996," and that CTFG "expects to report a loss for the fourth quarter of 1996."
On March 3, 1997, CTFG issued a press release stating that these credit losses totaled $18 million. Barlow, CTFG's president and chief executive officer, stated in the press release that "[w]e have taken the necessary steps to ensure that the reserves in our existing portfolio are adequate and that we control the amount of credit losses."
On March 13, 1997, one month after the close of the split-off transaction, Dolph became the Chief Financial Officer of CTFG.
On March 31, 1997, CTFG filed its 1996 Form 10-K with the SEC stating that "the nonrefundable dealer discount and allowance for credit losses are sufficient to cover existing estimated losses." Dolph claimed in his deposition that he did not assist in the preparation of the 1996 Form 10-K. Further, he stated that he only signed the document at the request of CTFG's counsel, and that he did so after checking with management and KPMG to ensure that they were comfortable with the analysis and projections in the document.
Dolph testified in his deposition that after beginning his work at CTFG he discovered the underestimates in CTFG's loan loss reserves by performing the industry standard evaluative technique, static pool analysis. According to Dolph, he built the static pool analysis from scratch. Dolph contends that as a result of his findings, RAC increased its reserves from $11 million to $33 million in the first quarter of 1997.
On May 7, 1997, CTFG issued a press release announcing that it was reporting a loss of $9.9 million for the first quarter, attributable to a provision for credit losses of $22.2 million in the quarter. The Form 10-Q for the first quarter noted the increased provision for credit losses and stated, "the Company does not currently know if further reserves for credit losses will be necessary.... There can be no *497 assurance that future special provisions may not be necessary, and if so, earnings would be adversely affected."
In the first quarter Form 10-Q, CTFG also announced Barlow's resignation as president and chief executive officer. Silverman, who assumed Barlow's positions, stated in the press release that CTFG was in default on some of its covenants to its lenders. CTFG's stock dropped 26% that day from $9.00 to $6.625. The next day, the Chicago Sun-Times reported that Silverman "insisted Reliance's balance sheet remains sound," and that "Silverman stressed his company's woes do not involve financial fraud or mismanagement."
Dolph further stated that after filing the first quarter Form 10-Q, he continued to investigate the practices of the company. He claims that in the second quarter of 1997, he discovered that RAC's branch offices did not follow the proper procedures for underwriting, deferment, due date changes, and repossessions. As he learned of this noncompliance, Dolph testified that he again increased the estimates for loan loss reserves. In the second quarter, RAC increased reserves for credit losses to $60.9 million.
On August 14, 1997, CTFG issued a press release reporting a loss of $40.2 million for the second quarter ending June 30, 1997, attributable in part to the $60.9 million provision for credit losses. CTFG filed its second quarter Form 10-Q the same day, disclosing that CTFG would severely curtail further 1997 operations because it "will probably have to use virtually all of its net cash flow to pay down its revolving credit agreement to $200 million." The second quarter Form 10-Q also addressed the credit loss changes. It stated:
The additional provision taken in the second quarter of 1997 was necessitated by significant increases in the Company's credit losses in the second quarter of 1997 and the Company's analysis of these losses employing a static pool reserve analysis, which is contained in this report.... The additional provisions taken during the second quarter significantly increased the Company's coverage ratio for credit losses.... Management is actively addressing the issue of the Company's increased credit losses with a view toward significantly lowering such losses in the near term .... The Company is seeking to lower credit losses through changes in personnel, policies, and actual practices.
On November 14, 1997, CTFG issued a press release announcing a loss of $12.8 million for the third quarter, attributable in part to a $10 million provision for credit losses. CTFG filed its Form 10-Q for the third quarter the same day, and announced that "[i]f the Company is not able to sell, merge or recapitalize itself in the near term, resorting to federal bankruptcy protection is very likely."
On February 9, 1998, CTFG filed a petition for relief under chapter 11 of the United States Bankruptcy Code in the District of Delaware.

D. Summary of RAC's Growth

In sum, RAC's loan portfolio grew from $24 million in 1993 to almost $400 million in 1996. At the same time, the percentage rate of net charge-offs to average finance receivables increased from 0.48% in 1993, to 0.92% in 1994, to 3.02% in 1995, and to 10.83% in 1996. Delinquent receivables and repossessions as a percentage of gross receivables and repossessions increased from 0.47% in 1993, to 1.23% in 1994, to 2.27% in 1995, to 2.88% in 1996.
The loss rate for RAC's loans increased annually, from 4.5% in 1993, to 9.9% in 1994, to 20.3% in 1995, to 25.3% in 1996. *498 During this same time period, plaintiffs allege RAC's loan loss reserves dropped from 6.18% of its total loans in 1993 to 4.08% by 1996.

E. Procedural Background

Beginning in January 1998, CTFG shareholders filed nine different lawsuits in the United States District Court for the Western District of Texas against officers, directors, accountants, financial advisors, subsidiaries of CTFG, and other entities formed in the split-off transaction. That case is presently captioned Sabbia v. Reliance Acceptance Group, Inc., C.A. No. 99-859-RRM. On February 2, 1998, CTFG shareholders filed a lawsuit against similar defendants in the United States District Court for the Northern District of Illinois in the case presently captioned Graham v. Taylor Capital Group, Inc., C.A. No. 99-858-RRM.
The plaintiffs in the Texas lawsuits and the Illinois suit assert securities law claims and supplemental state law claims against the defendants. The Illinois plaintiffs amended their complaint on March 20, 1998, adding the Financial Advisors as defendants.
On March 11, 1998, a group of putative lead plaintiffs in the Texas litigation, consisting of Michael Sabbia, Darius Antia, Michael Havrilesko, Bank West Financial Corp., Walter W. Goldberg IRA Rollover, and Michael Wien (collectively, "the Sabbia Group"), filed a motion in the Texas court to be appointed lead plaintiffs. On April 7, 1998, the Sabbia Group filed a motion in the Illinois court to be appointed lead plaintiffs in that case.
On June 1, 1998 and June 9, 1998, the Texas court ordered the consolidation of the nine lawsuits. On June 29, 1998, upon consideration of competing motions for appointment of lead plaintiffs, the Texas court appointed the Sabbia Group lead plaintiffs in its court. The court found that the Sabbia Group had the largest financial interest in the litigation, and that they satisfied the other requirements imposed by Fed.R.Civ.P. 23 for appointment as lead plaintiffs.[2] On the same date, the Texas court approved the Sabbia Group's choice of David B. Kahn & Associates, Ltd. and Milberg Weiss Bershad Hynes & Lerach LLP as co-lead counsel.
After being appointed lead plaintiffs in the Texas litigation, the Sabbia Group argued to the Illinois court that they should be appointed lead plaintiffs in the Illinois case to permit a unified lead plaintiff structure in both cases. On July 16, 1998, the Illinois court appointed the Sabbia Group lead plaintiffs and approved their choice of David B. Kahn & Associates, Ltd. and Milberg Weiss Bershad Hynes & Lerach LLP as co-lead counsel.
Beginning in August 1998, a number of defendants in the Texas litigation moved to transfer the case to the Northern District of Illinois pursuant to 28 U.S.C. ง 1404(a).[3] Other defendants in the Texas lawsuit moved for coordination or consolidation of *499 the Texas and Illinois actions pursuant to 28 U.S.C. ง 1407.[4]
On August 18, 1998, the Sabbia Group filed a consolidated amended complaint in Illinois. This consolidated amended complaint is the focus of this Opinion, and the court will discuss its contents in greater detail below. On August 21, 1998, the Sabbia Group, on behalf of the Sabbia plaintiffs, filed a consolidated amended complaint in the Texas litigation.
On September 4, 1998, David Allen, the estate representative of the chapter 11 estate of Reliance Acceptance Group, Inc. and its subsidiaries, filed two adversary bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware against many of the defendants named in the Texas and Illinois lawsuits. Allen asserts state law fraudulent transfer claims, fiduciary duty claims, professional malpractice claims, and other related common law claims. On March 12, 1999, a number of the defendants in these adversary bankruptcy proceedings moved in the United States District Court for the District of Delaware to withdraw the reference to the Bankruptcy Court and on June 23, 1999 moved to consolidate the adversary proceedings. On July 15, 1999, the District Court granted the motion to consolidate the cases, and on July 22, 1999, the District Court granted the motion to withdraw the reference to the Bankruptcy Court. The consolidated adversary bankruptcy proceedings are presently captioned Allen v. Taylor, C.A. No. 99-146-RRM.
On November 3, 1999, the Illinois court ordered the dismissal without prejudice of the consolidated amended complaint in the Graham case with respect to defendants Tinberg and Dougherty.
On December 9, 1999, the Judicial Panel on Multidistrict Litigation ordered the transfer of the Texas and Illinois lawsuits to the United States District Court for the District of Delaware to consolidate pretrial proceedings with the adversarial bankruptcy proceedings. Centralizing pre-trial proceedings in this court, the Panel ruled, was necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel and the judiciary.
In early 2000, defendants moved to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 4(m) for failure to serve process within 120 days, Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, and Fed.R.Civ.P. 9(b) and ง 21D(b) of the Private Securities Litigation Reform Act, 15 U.S.C. ง 78u-4(b)(1, 2), for failure to plead fraud with specificity. On April 19, 2000, this court denied defendants' motions.
On October 31, 2000, the court granted plaintiffs' motion for class certification. The court defined the class as (1) all purchasers of the common stock of CTFG/Reliance during the period between March *500 14, 1995 and November 14, 1997, inclusive; (2) all persons who had a right to vote at CTFG's annual meeting on November 15, 1996 to approve the split-off pursuant to the Proxy Statement dated October 16, 1996; and (3) all members of RAC's ESOP and the 401(k)/profit sharing plan as of the November 15, 1996 shareholder meeting. Excluded from the class are the defendants, members of the defendants' immediate families, and any entity controlled by CTFG or any such excluded person or which is a parent or subsidiary of such an entity.
Since denying the motions to dismiss, defendants have moved for summary judgment that they are not liable under sections 10(b), 14(a), or 20(a) of the Exchange Act and did not breach fiduciary duties under Delaware law by failing to disclose material facts necessary for the shareholders to make informed investment decisions.

F. The Complaint

The present opinion concerns defendants' motions for summary judgment on claims in the consolidated amended complaint filed in case in the Illinois court on August 16, 1998. Plaintiffs assert five counts against defendants.
Count I of the complaint alleges that a number of the individual officers and directors of CTFG, namely, Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole,[5] Lori Cole, Barlow, Silverman, Dolph, Alstrin, Bernick, Race, Mangano, Firestone, Pearl, Griffith, and CTFG's auditor, KPMG, are liable under section 10(b) of the Exchange Act of 1934, 15 U.S.C.A. ง 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. ง 240.10b-5, for knowingly or recklessly making public statements containing material misrepresentations regarding the financial condition of CTFG.
Count II alleges that Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Mangano, Firestone, Pearl, Griffith, Barlow, Silverman, Alstrin, Bernick, Race, Richard Tinberg, Adelyn Dougherty, KPMG, and the Financial Advisors are liable under section 14(a) of the Exchange Act, 15 U.S.C.A. ง 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. ง 240.14a-9, for knowingly or recklessly making material misstatements in the October 1996 Proxy Statement.
Count III alleges that Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Mangano, Firestone, Pearl,[6] Griffith, Barlow, Silverman, Alstrin, Bernick, and Race are vicariously liable under section 20(a) of the Exchange Act, 15 U.S.C. ง 78t(a), for violations of the securities laws by persons they controlled.
Count IV alleges that Taylor Capital, Tinberg, Dougherty, Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Mangano, Firestone, Pearl, Griffith, Barlow, Silverman, Alstrin, Bernick, and Race breached their fiduciary duties to plaintiffs under Delaware law by failing to disclose material facts necessary for shareholders to make informed investment decisions.
Count V alleges that Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Taylor Capital, *501 and Cole Taylor Bank breached their fiduciary duties arising under ERISA when they engaged in self-dealing by acquiring Cole Taylor Bank for inadequate consideration.
Plaintiffs seek compensatory damages.

G. Motions for Summary Judgment

Irwin Cole, Lori Cole, Dolph, Race, Firestone, Mangano, Griffith, Pearl, and KPMG have moved for summary judgment that they did not make materially false or misleading statements in connection with the purchase or sale of a security under section 10(b) of the Exchange Act.
Irwin Cole, Lori Cole, Barlow, Race, Firestone, Mangano, Griffith, Pearl, KPMG, and the Financial Advisors have moved for summary judgment that they did not make false or misleading statements as to any material fact in connection with the solicitation of a proxy under section 14(a) of the Exchange Act.
Irwin Cole, Lori Cole, Race, Firestone, Mangano, and Griffith have moved for summary judgment that they are not liable as control persons under section 20(a) of the Exchange Act.
Irwin Cole, Lori Cole, Race, Mangano, Firestone, Griffith, and Pearl have moved for summary judgment that they did not breach any fiduciary duty owed to the shareholders under state law. Sidney Taylor, Jeffrey Taylor, Bruce Taylor, Alstrin, and Pearl moved for summary judgment that they cannot be sued by both the shareholder plaintiffs in a class action and the company via the estate representative for the same breach, involving the same claim, the same harm, and the same damages.

II. DISCUSSION

The court will apply Third Circuit law to resolve questions of federal law raised in defendants' motions to dismiss. See Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir.1993) ("[A] transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.").
Summary judgment is appropriate where there is not sufficient evidence to lead a reasonable jury to find for the nonmoving party. See Anderson, 477 U.S. at 249, 106 S.Ct. 2505. A party seeking summary judgment bears the initial burden to demonstrate the portion of the record which establishes the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After that, a court may enter summary judgment against a nonmoving party "who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322-323, 106 S.Ct. 2548.

A. Motions for Summary Judgment Under Section 10(b)

Section 10(b) of the Exchange Act prohibits fraud in connection with the purchase or sale of securities. The statute states: "It shall be unlawful for any person, directly or indirectly ... (b) to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. ง 78j(b). The Supreme Court described this section "as a catchall clause to enable the Commission to deal with new manipulative (or cunning) devices." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 203, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (quotations omitted). Rule 10b-5, promulgated under section 10(b) states:
It shall be unlawful for any person, directly or indirectly ...

*502 (a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. ง 240.10b-5.
To state a claim under section 10(b) and Rule 10b-5, a private plaintiff must demonstrate: (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security; (2) scienter on the part of the defendant; (3) reliance on the misrepresentation; and (4) damage resulting from the misrepresentation. See Newton v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc., 135 F.3d 266, 269 (3d Cir.1998).
A fact is material if "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (adopting the section 14(a) standard of materiality from TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). To meet the scienter prong, a plaintiff must show that the defendant made a deliberate or reckless misrepresentation. See Ernst & Ernst, 425 U.S. at 193, 96 S.Ct. 1375; Newton, 135 F.3d at 272-72.

1. Did defendants make misstatements or omissions of a material fact?

a. Outside directors

Plaintiffs argue that defendants, as members of CTFG's board, made fraudulent or misleading statements by approving SEC documents that overstated the income and net worth of RAC and CTFG by materially undervaluing RAC's loan loss reserve. Lori Cole, Irwin Cole, Race, Firestone, Mangano, and Griffith argue that their approval of publicly disclosed SEC documents does not constitute a statement under section 10(b) of the Exchange Act. That is, these defendants contend that plaintiffs cannot attribute to them statements found solely in documents CTFG filed with the SEC.
Defendants made this same argument in support of their motions to dismiss. There, plaintiffs argued that because each of the directors served on committees responsible for the financial oversight of CTFG, they should be held liable for misstatements in the SEC documents. See Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir.1987) ("In some cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other `group-published information,' it is reasonable to presume that these are the collective actions of the officers."). Defendants argued that outside, non-managing directors, that do not participate in the preparation of SEC documents, should not be liable under the group published doctrine for misstatements or misrepresentations contained in the documents. That is, the outside directors contend that the group published doctrine does not apply unless plaintiffs could show that the directors had day-to-day operational involvement or a special relationship with the company with respect to allegedly misleading statement. See In re GlenFed, Inc. Sec. Litig., 60 F.3d 591, 593 (9th Cir.1995) (affirming the dismissal of complaint against outside directors where no particularized involvement in the company's operations was alleged). *503 In light of the directors' positions, the court denied defendants' motion to dismiss and gave plaintiffs the opportunity to take discovery to determine the role that those defendants played in the company and the extent to which those defendants had knowledge of the alleged inadequacy of the loan loss reserves. See In re Reliance Sec. Litig., 91 F.Supp.2d at 720.
Irwin Cole, Lori Cole, Race, Firestone, Mangano, and Griffith have renewed this argument in their motions for summary judgment. According to Irwin and Lori Cole, they did not breach a duty under Rule 10b-5 because neither of them made a false or misleading statement and plaintiffs cannot maintain a claim for aiding and abetting a violation of Rule 10b-5. Race, Firestone, Mangano, and Griffith contend that they did not participate in the day-to-day affairs of the company and had no operational responsibilities. Therefore, they contend that a signature on SEC filings does not make them liable for the contents of the document.
Plaintiffs argue that Irwin Cole signed CTFG's 1994 Form 10-K, Lori Cole signed the 1995 and 1996 Forms 10-K, and that Jeffrey Taylor and James Kaplan signed the Proxy Statement on behalf of all of the directors. Further, according to plaintiffs, the Proxy Statement incorporated by reference CTFG's 1995 and 1996 Forms 10-K and Forms 10-Q from the first and second quarter of 1996. According to plaintiffs, these documents contained false and misleading statements that overstated RAC's income and net worth by understating its loan loss reserves. Consequently, plaintiffs contend, those documents overstated the value of RAC. Thus, plaintiffs argue that by signing these documents, Irwin Cole and Lori Cole are liable as the primary violators, rather than as aiders or abettors. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061-62 (9th Cir.2000) (finding that "a corporate official ... who, acting with scienter, signs a SEC filing containing misrepresentations `make[s]' a statement so as to be liable as a primary violator under ง 10(b)").
Plaintiffs also argue that Firestone, Mangano, and Griffith all expressly admitted in deposition testimony that as members of the Audit and Examining Committee they provided oversight on audit and control matters and ensured that the financial reports of CTFG were prepared to accurately reflect the results of business conducted. Race served as both a member of the Audit and Nominating Committee and as Chairman of the Finance Oversight Committee of CTFG. According to plaintiffs, Race therefore had an additional responsibility to oversee the preparation and accuracy of CTFG's financial reports. Thus, plaintiffs argue these defendants do not fall under the exception to the group published doctrine articulated by the Ninth Circuit in In re GlenFed, Inc. Sec. Litig.
In Howard, the Ninth Circuit found that an officer who signs an SEC filing makes a statement under section 10(b), even if the officer did not participate in the drafting of the document. See Howard, 228 F.3d at 1061. The court reasoned that corporate officers ought to be held responsible for the statements in the documents and that "by placing responsibility in corporate officers to ensure the validity of corporate filings, investors are further protected from misleading information." Id. The court further stated, "[k]ey corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." Id. at 1062. This court finds that this rationale applies equally to the director defendants here. *504 Irwin Cole and Lori Cole had adequate opportunity to review the allegedly misleading documents. Race, Firestone, Mangano, and Griffith each had some responsibility for oversight of the auditing of CTFG's and RAC's financial statements. Thus, the court finds by signing the documents CTFG filed with the SEC, defendants made statements under section 10(b).

b. Pearl

Pearl, like the outside directors, recognizes that plaintiffs' claim against him is based on the financial statements that he signed, CTFG's 1994 and 1995 Forms 10-K, the Proxy Statement and the financial statements incorporated therein. But rather than argue that those documents do not constitute statements under section 10(b), Pearl contends that the otherwise material statements in the SEC documents are immaterial because the statements relate to management's opinions and beliefs about the strength and quality of CTFG's loan portfolio and its forecasts of the adequacy of the loan loss reserve going forward. According to Pearl, these statements are immaterial under the SEC safe harbor provision for forward-looking statements, 15 U.S.C. ง 78u-5, and the bespeaks caution doctrine, a judicially created doctrine that renders alleged omissions or misrepresentations immaterial as a matter of law if prefaced by sufficient cautionary language.
According to Pearl, plaintiffs cannot maintain a claim based on the statements in SEC documents regarding loan loss reserves. Pearl contends that "reserving for losses is, by definition, an estimate of the company's future losses." As such, Pearl argues that they are forward looking statements and protected by the safe harbor provision of the Exchange Act, 15 U.S.C. ง 78u-5. "Under that provision, an issuer is not liable for a forward-looking statement if it is `identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" EP Medsystems, Inc. v. EchoCath, 235 F.3d 865, 873-74 (3d Cir.2000) (quoting 15 U.S.C. ง 78u-5(c)(1)(A)(i)).
In an earlier opinion, this court found that these statements are not projections, but are directed to the then-present state of CTFG's financial condition. See In re Reliance Sec. Litig., 91 F.Supp.2d at 721; see also generally Shapiro, 964 F.2d at 281 ("There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws."). As such, the court finds that statements regarding loan loss reserves are not protected by the safe harbor provision. Given plaintiffs' allegations that defendants misstated the value of RAC by understating the loan loss reserves, the court finds that these statements are not immaterial under the statutory safe harbor provision.
Pearl further argues that plaintiffs' claims fail because the documents upon which plaintiffs based their claims contained extensive and specific cautionary language. According to Pearl, the cautionary language in the documents makes the alleged misrepresentations immaterial under the bespeaks caution doctrine. See In re Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir.1993) ("[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law."). In order to apply, the cautionary language must be directed to forward looking statements and must relate directly to those statements on which investors claim to have relied. See EP Medsystems, *505 Inc., 235 F.3d at 874 ("By its terms, the `bespeaks caution' doctrine, like the safe harbor provision in the Reform Act, is directed only to forward-looking statements."); Kline v. First Western Gov't Sec., Inc., 24 F.3d 480, 489 (3d Cir. 1994) ("Not just any cautionary language will trigger application of the doctrine. Instead, disclaimers must relate directly to that on which investors claim to have relied."). Here, even assuming the cautionary language is sufficiently tailored, the bespeaks caution doctrine does not apply because the language was not directed to forward looking statements. Therefore, the court finds that the bespeaks caution doctrine does not render the statements immaterial.

c. Dolph

Dolph began work at CTFG on March 13, 1997 as the company's chief financial officer. On March 31, 1997, CTFG filed its 1996 Form 10-K with Dolph's signature. He also signed the first and second quarter Forms 10-Q for 1997. Dolph contends that his signature on the 1996 10-K should not constitute a statement. For the reasons stated above, the court finds that this constitutes a statement under section 10(b). See Part II.A.1a; see also Howard, 228 F.3d at 1061-62 (finding that "a corporate official ... who, acting with scienter, signs a SEC filing containing misrepresentations `make[s]' a statement so as to be liable as a primary violator under ง 10(b)").
Dolph also contends that statements in the Forms 10-Q and 10-K regarding the reserve estimates should be protected under the safe harbor provision of the PLSRA, 15 U.S.C. ง 78u-5(c), or the bespeaks caution doctrine. For the reasons previously stated, the court finds that statements about loan loss reserves are not projections, but are directed to the then-present state of CTFG's financial condition. Therefore, the statements are not protected by the safe harbor provision or the bespeaks caution doctrine.

d. KPMG

KPMG argues that any misstatement or omission it made is not material. That is, according to KPMG plaintiffs cannot meet the materiality requirement for either the section 10(b) or 14(a) claim because plaintiffs have no "quantitative evidence that [RAC's] loan loss reserves were materially inadequate at year-end 1994, 1995, or 1996." A misrepresentation or omitted fact is material if "`there is a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available.'" Basic Inc., 485 U.S. at 231-32, 108 S.Ct. 978 (quoting TSC Indus., Inc., 426 U.S. at 449, 96 S.Ct. 2126); see also EP Medsystems, Inc., 235 F.3d at 872.
Plaintiffs allege that KPMG's audit reports on RAC's 1994, 1995, and 1996 financial statements were fraudulent because KPMG knew or should have known that RAC's estimates of loan losses were understated. Individuals generally rely on the information such as the adequacy of loan loss reserves in forming and making investment decisions. See Shapiro, 964 F.2d at 281 ("[A] reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers."). A court may dismiss a case based on understatement of loan loss reserves when the alleged reserve understatement was so small as to be immaterial as a matter of law. See In re Westinghouse *506 Sec. Litig., 90 F.3d 696, 714 (3d Cir.1996). Here, however, plaintiffs allege a far more substantial understatement. RAC reported profits of $4.3 million, $9.6 million, and $4.6 million in 1994, 1995, and 1996 respectively. According to the affidavit of plaintiffs' expert Ernest L. Ten Eyck, a Certified Public Accountant, a reasonable estimate of the losses RAC should have reported for those years is approximately $475,000, $21 million, and $35.3 million. If plaintiffs allegations are true, the loan loss understatement would have been significant to the decision-making process of the reasonable investor. At this stage of the proceeding, the court finds that KPMG is not entitled to a summary judgment that it did not breach a duty to disclose information about the loan loss reserves because genuine issues of material fact remain as to whether KPMG knowingly or recklessly approved financial statements from CTFG that stated that RAC had appropriate allowance for loan losses and thus overstated the net worth and income of RAC.

2. Did defendants act with scienter?

Scienter is "`a mental state embracing intent to deceive, manipulate or defraud.'" See Dirks v. SEC, 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (quoting Ernst & Ernst, 425 U.S. at 193-94 n. 12, 96 S.Ct. 1375). Plaintiffs may establish scienter by demonstrating either a "deliberate or reckless misrepresentation of a material fact" by defendants. Newton, 135 F.3d at 273. A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir.1999) (citation omitted); see also Hudson v. Phillips Petroleum Co. (In re Phillips Petroleum Sec. Litig.), 881 F.2d 1236, 1244 (3d Cir.1989). Thus, to succeed on a motion for summary judgment, defendants must show that a jury could not reasonably find that defendants' statements were an extreme departure from the standards of ordinary care. See In re Phillips Petroleum Sec. Litig., 881 F.2d at 1247. Summary judgment is inappropriate if a reasonable jury could conclude that "the defendant lacked a `genuine belief that the information disclosed was accurate and complete in all material respects.'" Id. at 1244 (quoting McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir.1979)).

a. Outside Directors

In their motions to dismiss, Irwin Cole, Lori Cole, Pearl, Race, Firestone, Mangano, and Griffith argued that plaintiffs failed to plead facts supporting a finding of recklessness under section 10(b). After reviewing the case law and the allegations, the court denied defendants motions finding that plaintiffs' allegations were sufficient to find that defendants may have acted recklessly in preparing, reviewing, or approving CTFG's financial disclosure. Defendants have renewed their arguments in the context of a motion for summary judgment.
Defendants argue that plaintiffs cannot show that they acted with scienter when they signed the SEC documents with the alleged misstatements. These defendants voted in favor of the split-off transaction, afterward remained with CTFG, and had significant financial investments in the company. Therefore, these defendants contend they would have acted irrationally to engage in activity contrary to their economic interests. That is, because CTFG would retain control of RAC and they had *507 a significant investment in CTFG, it would be irrational for defendants to encourage the split-off transaction if they knew that RAC was in dire financial difficulty. Further, defendants contend that as outside directors, they did not participate in the preparation of CTFG's financial statements or the setting of its loan loss reserves, rather they relied on the information that KPMG and CTFG management provided for their review in evaluating the strategic direction and fiscal health of the corporation.
Plaintiffs contend that even if these defendants did not have a motive to engage in fraud, defendants acted recklessly when they ignored express warnings from internal audits and the Federal Reserve Bank regarding deficiencies at RAC's branch offices and red flags about the deterioration of RAC's loan portfolio. Plaintiffs point to several reports given to the board as evidence that the director defendants should have known that RAC was in financial trouble: the November 1995 Federal Reserve Board report that described the deterioration of the loan portfolio and the high staff turnover in RAC's branch offices, internal audit reports describing weaknesses in the internal audit controls and underwriting procedures at several of RAC's branch offices, and negative trends in RAC's public financial disclosures. Further, plaintiffs contend that the fact that Dolph recognized CTFG's difficulty within weeks of his start date is further evidence that the board should have been aware of RAC's problems.
Plaintiffs may not impute knowledge of CTFG's financial infirmities to defendants solely by nature of the positions that the defendants held. See In re Advanta Sec. Litig., 180 F.3d at 539. Irwin Cole, Lori Cole, Pearl, Race, Firestone, Mangano, and Griffith each served on CTFG's Audit and Examining Committee. Plaintiffs contend that they can put forth evidence to show that defendants "received repeated warnings of significant accounting and control problems," that "defendants had been specifically warned that [RAC's] loan portfolio quality had been deteriorating and was expected to continue to do so," and that "the FRB had rated all of the branch offices it had reviewed as marginal or unsatisfactory."
As further noted in the motion to dismiss, RAC experienced a sharp increase in the loss rate on its loans, from 4.5% in 1993 to 25.3% in 1996. During this same time period, RAC's loan loss reserves allegedly declined as a percentage of finance receivables, in violation of GAAP. GAAP violations, alone, do not constitute fraud. See In re First Merchants Acceptance Corp. Securities Litigation, 1998 WL 781118 (N.D.Ill. Nov. 4, 1998) (citations omitted). When combined with other evidence suggesting fraudulent intent, however, allegations of improper accounting may support a strong inference of recklessness. See id.; Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1255 (N.D.Ill.1997).
In the motion to dismiss the court found that plaintiffs set forth sufficient allegations to suggest fraudulent intent. The court stated:
During the class period, [CTFG's] officers and directors made numerous statements to the press and in its financial disclosure statements reassuring investors that [CTFG's] loan loss reserves were sufficient. Defendants allegedly had knowledge of the deteriorating condition of [CTFG's] loan portfolio, as discussed above. See Advanta, 180 F.3d at 539 (identifying knowledge of defendants as key factor in scienter inquiry). Maintaining adequate loan loss reserves was purportedly critical to the financial integrity of [CTFG]. See In re Tel-Save Securities Litigation, 1999 WL 999427, *508 at * 4 (E.D.Pa. Oct. 19, 1999) ("The inquiry focuses on whether the transaction in which the alleged fraud occurred was central to the corporation's core business."); Rehm, 954 F.Supp. at 1256 (stating that credit losses were the "defining characteristic" of loan servicing business). If [CTFG's] loan loss reserves actually declined as a percentage of net income during the time when its loan loss rate was increasing, then the individual defendants' conduct may amount to more than a failure to assess risks or to recognize a negative trend in the industry. See Advanta, 180 F.3d at 539-40; Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124 (2d Cir.1994); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990). The week prior to the close of the split-off transaction, [CTFG] delayed the release of its financial disclosure statements, and then, two days after the closing, [CTFG] announced it would take charges against its income for credit losses, later quantified at $18 million. See Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1224 (1st Cir.1996) (stating that timing of disclosures may constitute circumstantial evidence of fraud). Moreover, Dolph apparently discovered that [CTFG's] income was overstated within weeks of becoming its CFO, as shown by the increasing charges he took against the Company's income in its 1997 financial disclosure statements. See First Merchants, 1998 WL 781118, at *11 (denying motion to dismiss where new CFO "almost immediately discovered the discrepancies in the financial statements").
See In re Reliance Sec. Litig., 91 F.Supp.2d at 724. With these allegations and in light of the facts plaintiffs have identified, the court finds that a reasonable juror could conclude that these defendants did not have a genuine belief in the accuracy of the financial statements or that if the these defendants did believe that the financial statements were accurate that they did not act with due care in researching the true financial state of CTFG. Therefore, the court finds that these defendants are not entitled to summary judgment that they did not act recklessly in approving publicly disclosed documents that may have had misstatements or omissions.

b. Dolph

Dolph contends that he did not act recklessly with regard to the SEC documents he signed. On March 13, 1997, CTFG hired Dolph as its chief financial officer one month after the close of the split-off transaction. On March 31, 1997, CTFG filed its 1996 Form 10-K.
Dolph stated in his deposition that he did not assist in the preparation of the 1996 Form 10-K. Further, he stated that he only signed the document at the request of CTFG's counsel, and that he did so after checking with management and KPMG to ensure that they were comfortable with the analysis and projections in the document. Thus, he claims that he did not behave recklessly with regard to that document. Further, Dolph claims that he discovered the underestimates in CTFG's loan loss reserves and, as a result, RAC increased its loan loss reserves in both the fast and second quarter of 1997.
Plaintiffs contend that Dolph knew that his increases in the loan loss reserves in the first and second quarters of 1997 were still inadequate to offset the deterioration of the loan portfolio. Further, plaintiffs argue that based on CTFG's prior SEC filings Dolph should have known, even before his arrival at the company, that the loan loss reserves were inadequate. Thus, despite increasing the loan loss reserves twice within six months of his hiring, plaintiffs claim that Dolph defrauded the public in the SEC documents because he knew *509 that RAC provided less than adequate reserves.
In the motion to dismiss, the court cautioned that "[p]laintiffs' allegations of recklessness are weakest as to Dolph." Id. at 725. Dolph discovered and took active steps to correct the deficiency in loan loss reserves. Further, Dolph made forthright statements in the SEC public documents regarding the nature of the need to increase the loan loss reserves and the difficulties in the branch offices. The Forms 10-Q that Dolph signed did not proclaim the adequacy of the loan loss reserves, rather they described a company in the midst of change and reformation. Dolph's actions during that period were far from "an extreme departure from the standards of ordinary care." Dolph moved steadily toward bring CTFG's accounts into compliance with GAAP.
Thus, the court finds that Dolph is entitled to summary judgment because no reasonable juror could find that Dolph recklessly disclosed or failed to disclose material information about the financial state of RAC to the shareholders.

c. KPMG

In the motion to dismiss, KPMG argued that plaintiffs failed to allege reckless behavior because calculating loan loss reserves is a matter of professional judgment. Further, KPMG argued allegations that KPMG violated GAAP would not support a claim under Rule 10b-5. Plaintiffs countered arguing that KPMG should have been aware that the loan portfolio was rapidly expanding and RAC was making increasingly risky loans. Plaintiffs also contended that based on reports from the Federal Reserve Board and other information, KPMG should have known that the quality of the portfolio was deteriorating. Thus, according to plaintiffs, KPMG's statements that CTFG complied with GAAP, were outside the bounds of professional judgment and constituted an extreme departure from ordinary care.
The court concluded that KPMG may have acted recklessly in stating that CTFG's financial statements were in compliance with GAAP. The court placed "particular emphasis on plaintiffs' allegations that [CTFG's] loan loss reserves declined from 1993 to 1996 while its loan loss rates increased." In re Reliance Sec. Litig., 91 F.Supp.2d at 726. Because KPMG did not dispute that CTFG "could reduce its loan loss reserves in compliance with GAAP only if the risk associated with its loan portfolio was decreasing" the court found that, "by stating that [CTFG's] financial disclosure statements were in compliance with GAAP, it may have made accounting judgments that no reasonable accountant would have made if confronted with the same facts." Id. at 726-727.
Nonetheless, KPMG renews its argument in its motion for summary judgment. KPMG claims that to show that KPMG acted with scienter, plaintiffs must demonstrate that the audits of CTFG were merely sham audits. Further, KPMG argues that plaintiffs cannot demonstrate scienter simply by pointing to an awareness of negative information or by second guessing KPMG's conclusions.
In order to demonstrate scienter on behalf of an independent auditor, plaintiffs must "establish that the defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects." See McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir.1979). Further, "to prove scienter the plaintiff need not produce direct evidence of the defendant's state of mind. Circumstantial evidence may often be the principal, if not the only, means of proving bad faith." Id. In light of the *510 specific allegations regarding the information available to KPMG, the court finds that genuine issues of material fact remain as to what KPMG knew or should have known about CTFG's loan portfolio. A reasonable juror could conclude that auditors at KPMG did not believe that the loan loss reserves were adequate, especially given the speed with which Dolph uncovered the deficiencies in the reserves. Thus, a reasonable juror could conclude that KPMG acted with the recklessness necessary to constitute scienter. Therefore, the court will deny KPMG's motion for summary judgement that it did not violate section 10(b) of the Exchange Act.

3. Have plaintiffs shown causation?

Only Pearl has disputed causation in his motion for summary judgment. Pearl argues those plaintiffs who purchased shares of CTFG after February 12, 1997 โ the date of the close of the split-off transaction and his resignation from the CTFG and RAC Boards of Directors โ did not rely on representations made by Pearl. Citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), plaintiffs' contend that although Pearl stopped putting fraudulent information into the market when he resigned from CTFG, the effect of a fraudulent statement only ends when full disclosure "discredits the other one so obviously that the risk of real deception drops to nil." This court agrees and finds that plaintiffs may be able to show that individual purchasers or shareholders could have relied on documents published while Pearl worked for CTFG even after his resignation from the board. That is, Pearl's resignation is not enough to break the chain of causation.

4. Have plaintiffs shown damages?

Only the Coles challenge plaintiffs' claim of damages. Irwin and Lori Cole argue that plaintiffs cannot produce evidence of damages. Specifically, the Coles contend that plaintiffs' damages expert, Scott Hakala, assumes "that all of the plaintiffs' allegations of fraud are true and that all of the alleged fraudulent misrepresentations are attributable to all defendants." According to the Coles, plaintiffs have dropped their claim that the Coles are responsible for all of the statements alleged in the complaint and have not shown damages for those specific statements attributable to the Coles โ the 1994, 1995, and 1996 Forms 10-K, and the Proxy Statement. Plaintiffs contend that their expert has set forth a model of damages based on defendants' misrepresentations and omissions sufficient to overcome a motion for summary judgment. The court agrees. Defendants have not put forth a damages expert that rebuts Hakala's damages model. Therefore, the court finds that genuine issues of material fact remain regarding the appropriate measure of damages in this case.

B. Motions for Summary Judgment Under Section 14(a)

Section 14(a) of the Exchange Act regulates the solicitation of proxies. It makes it unlawful for a person "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security ... registered pursuant to section 12 of this Act." 15 U.S.C. ง 78n(a). Rule 14a-9, promulgated under section 14(a), prohibits solicitation of proxies by means of a false or misleading proxy statements. The Rule states:
No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of *511 meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
17 C.F.R. ง 240.14a-9(a).
"The purpose of ง 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." J.I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The Supreme Court recognized a private right of action under section 14(a). See id. To prevail on the merits of a section 14(a) claim, a plaintiff must show that (1) the defendant made a material misrepresentation or omission in a proxy statement (2) with the requisite state of mind (3) that caused the plaintiffs injury and (4) the proxy solicitation was an essential link in the accomplishment of the transaction. See General Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir.1992); Halpern v. Armstrong, 491 F.Supp. 365, 378 (S.D.N.Y.1980).
An omission or misstatement is material if there is a substantial likelihood that a reasonable shareholder would consider the fact significant in deciding how to vote. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 189-90 (3d Cir.1988); Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 771 (3d Cir.1976). Stated another way, there must be a substantial likelihood that a reasonable investor would view the omitted or misleading facts as significantly altering the total mix of information made available in the proxy statement. See TSC Indus., Inc. 426 U.S. at 449, 96 S.Ct. 2126.
To demonstrate the requisite state of mind, plaintiffs must show that defendants acted negligently with respect to the facts in the proxy statement. See Gould, 535 F.2d at 777-78. In enforcing that standard, courts should apply the standard of due diligence rather than the standard of actual knowledge or gross negligence. See id. As the Second Circuit stated, "where the plaintiffs represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the statement, they are not required to establish any evil motive or even reckless disregard of the facts." Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298-1301 (2d Cir.1973). The Second Circuit reasoned, that "a broad standard of culpability [under section 14(a) ] will serve to reinforce the high duty of care owed by a controlling corporation to minority shareholders in the preparation of a proxy statement seeking their acquiescence in this sort of transaction." Id.

1. Did defendants make material misrepresentations or omissions in the Proxy Statement?

a. Individual defendants

Barlow, Race, Firestone, Mangano and Griffith argue that they did not participate in the preparation or drafting of the Proxy Statement and therefore are not liable for any statements contained in the document. According to these defendants, CTFG's general counsel, James Kaplan, and attorneys from Katten, Muchin & Zavis and *512 Mayer, Brown & Platt prepared the Proxy Statement.
Plaintiffs can attribute the misstatements or omissions of the Proxy Statement to the defendants that approved the document, if they can show that the defendants knew or should have known that the Proxy Statement contained material misrepresentations at the time of approval. See Gould, 535 F.2d at 777-78. In this respect, the analysis of the first two prongs of the test merge such that if plaintiffs can prove that defendants negligently performed their duties as officers and directors, the court will attribute statements in the documents to the defendants. The court finds that a reasonable jury could conclude that defendants did not exercise due diligence in approving the Proxy Statement and could attribute statements in the document to the defendants.

b. Pearl

Pearl argues that the misstatements and omissions in the Proxy Statement are not material as a matter of law because they are covered by the SEC safe harbor provision for forward looking statements, 15 U.S.C. ง 78u-5, and the bespeaks caution doctrine. As stated in part II.A.1.b., the court finds that statements about the adequacy of loan loss reserves in the Proxy Statement are not projections. Rather, these statements are directed to the then-present state of CTFG's financial condition. Therefore, the safe harbor provision and the bespeaks caution doctrine do not apply.

c. KPMG

As stated in part II.A.1.d. of this opinion, KPMG argues that plaintiffs have not alleged a misrepresentation of a material fact in connection with the Proxy Statement. That is, according to KPMG, plaintiffs cannot meet the materiality requirement for either the section 10(b) or 14(a) claim because plaintiffs have no "quantitative evidence that [RAC's] loan loss reserves were materially inadequate at year-end 1994, 1995, or 1996." For the reasons earlier in this opinion, the court will deny KPMG's motion for summary judgment that the representations in the Proxy Statement are not material as a matter of law.

2. Did defendants act with the requisite state of mind?

a. Irwin Cole, Lori Cole, and Pearl

Irwin Cole, Lori Cole and Pearl argue that they acted within the appropriate standard of care when they signed the Proxy Statement. These defendants make two arguments. First, they contend that plaintiffs have not produced evidence to support the conclusion that they knew or in the exercise of due care should have known that CTFG underestimated its loan loss reserves in the Proxy Statement. Second, they contend that they justifiably relied on advice of the outside Financial Advisors, ABN AMRO and Sandler O'Neill, and the outside auditor, KPMG, in approving the Proxy Statement.
Plaintiffs counter arguing that the directors ignored warnings that would have led a reasonable director to inquire about the adequacy of the loan loss reserves. For example, plaintiffs contend that defendants ignored the 1995 Federal Reserve Board report that warned that RAC was making ever riskier loans to expand its loan portfolio and that employee turnover in RAC's branch offices indicated that the loan officers were not following internal guidelines for underwriting loans. Plaintiffs also contend defendants ignored the 1996 Federal Reserve Board report that indicated the loan portfolio was under-reserved. Second, plaintiffs contend that defendants *513 negligently relied on the outside consultants in contravention to the warnings identified above.
The court already found, in the context of liability under section 10(b), that genuine issues of material fact exist as to whether defendants acted with scienter in preparing, reviewing, or approving certain SEC documents. That is, defendants may have recklessly relied on management and outside consultants when they approved the SEC documents and ignored the warnings that plaintiffs have identified. Those documents were incorporated into the Proxy Statement. Plaintiffs allege defendants overlooked the same warnings in approving the Proxy Statement that they overlooked in signing the other SEC documents. These allegations are sufficient to suggest that genuine issues of material fact remain about whether defendants acted negligently in approving the Proxy Statement. Therefore, the court will deny Irwin Cole's, Lori Cole's, and Pearl's motion for summary judgment that they did not act with the requisite state of mind.

b. The Financial Advisors

In the complaint, the plaintiffs contend that in issuing their fairness opinions, the Financial Advisors, "disregarded numerous red flags indicating that [RAC] was underreserved and overvalued." The complaint lists the red flags as: growth of the portfolio; deterioration of the quality of the loans; the increase in the loan loss and delinquency rates; the November 1994 Federal Reserve Board report which lists the problems inherent in the subprime auto loan business; and the September Federal Reserve Board report, the 1995 and 1996 internal reports which list the difficulties at RAC's branch offices. Plaintiffs allege the Financial Advisors ignored these red flags because they "were motivated to go along with the powerful Taylor family." Further according to the complaint, "each of the Financial Advisor Defendants received over $1 million in fees, 70% of which was contingent on the closing of the Split-off."
The Financial Advisors argue that after reviewing and analyzing public financial disclosures; the views of the senior management of CTFG, RAC, and Cole Taylor Bank; and other internal and external financial reports, they properly concluded in their respective opinions that "the consideration to be received by [CTFG] pursuant to the [split-off agreement] is fair from a financial point of view, to the non-Taylor Family shareholders of [CTFG]." Further, ABN AMRO and Sandler O'Neill contend that by the terms of their agreements with CTFG, they were not obligated to perform an audit on top of KPMG's review of CTFG's finances. Rather, they were entitled to use and rely on financial information provided by CTFG. Paragraph 9 of ABN AMRO's engagement letter stated in relevant part:
in rendering its services hereunder [ABN AMRO] will be using and relying on information provided by CTFG or information available from public sources and other sources deemed reliable by [ABN AMRO] without independent verification thereof by [ABN AMRO] or independent appraisal by [ABN AMRO]. [ABN AMRO] does not assume responsibility for the accuracy or completeness of any of this information regarding the Company.
Sandler O'Neill's letter agreement stated:
The Company recognizes and confirms that Sandler O'Neill (a) will use and rely primarily on the Information [provided by the company] and on information available from generally recognized public sources in performing the services contemplated by this letter and in rendering the Opinion without having independently *514 verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) will not make an appraisal of any assets or collateral securing assets of the Company or the Second Party.
Rule 14a-9 only prohibits statements that are false. Courts must evaluate statements of opinion in a proxy materials differently than statements of fact because statements of opinion "are factual in two senses: [1] as statements that the directors do act for the reasons given or hold the belief stated and [2] as statements about the subject matter of the reason or belief expressed." Virginia Bankshares, Inc., 501 U.S. at 1092, 111 S.Ct. 2749. Thus, courts must analyze the veracity of a statement of opinion in two ways: whether the statement was objectively false (e.g., whether the split-off transaction was fair to the shareholders) and whether the statement was subjectively false (e.g., whether the Financial Advisors believed that the split-off transaction was fair). See Freedman v. Value Health, Inc., 958 F.Supp. 745, 752 (D.Conn.1997).
In Virginia Bankshares, the Supreme Court considered whether a plaintiff could sue a corporation's board of directors under section 14(a) for urging the shareholders to adopt a merger because the board believed that minority shareholders would achieve "high" value and a "fair price" for their stock. See Virginia Bankshares, Inc., 501 U.S. at 1090, 111 S.Ct. 2749. The Court interpreted the jury's verdict against the defendants as a finding that "the directors' statements of belief and opinion were made with knowledge that the directors did not hold the beliefs or opinions expressed." Id. The court then considered whether the statement must also be objectively false to be actionable. The Court noted, "to recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize ง 14(a) litigation confined solely to what one skeptical court spoke of as the `impurities' of a director's `unclean heart.'" Id. at 1096, 111 S.Ct. 2749. Further, the Court stated, "disbelief or undisclosed motivation standing alone, [is] insufficient to satisfy the element of fact that must be established under ง 14(a)." Id. From this, it is clear that objective falsity is necessary to make a statement actionable. However, this holding left open the question of whether a statement of opinion could be actionable if it were only objectively, but not subjectively false.
Two district courts have reached this issue. See Freedman, 958 F.Supp. at 745; In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248 (N.D.Cal.2000). In analyzing the holding of Virginia Bankshares, the Freedman court stated, "if the objective prong were both necessary and sufficient to establish liability, it seems odd that the Court would discuss at some length the contours of a plaintiffs' required showing under the subjective prong." Freedman, 958 F.Supp. at 753. The McKesson court stated, "material statements of fact are false if they are contradicted by true facts, [but] material statements of opinion are false only if the opinion was not sincerely held." In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d at 1265. The McKesson court reasoned further, "The teaching of Virginia Bankshares is that an opinion is only false if the speaker does not in fact hold that opinion. Thus, the securities laws do not create a general cause of action for negligence by investment advisers โ they only reach false statements by those investment advisers." Id. Consequently, both courts found that statement of opinion *515 must be both objectively and subjectively false.
This court agrees with this interpretation of Virginia Bankshares and finds that to succeed on the merits in this case, plaintiffs must show that the Financial Advisor's statements of opinion were both objectively and subjectively false. Conversely, to succeed on their motions for summary judgment, the Financial Advisors must show that no genuine issues of material fact exist as to whether their statements are objectively and subjectively false.
The court finds that plaintiffs have identified facts that may show that the Financial Advisors' statements of opinion are objectively false. Given the relative value of the assets exchanged in the split-off agreement, a reasonable juror could conclude that the fairness opinions were objectively false at the time they were written.
It is unclear what standard to apply in evaluating whether a statement of opinion is subjectively false. That is, can a plaintiff prove that a statement of opinion is subjectively false by demonstrating that a defendant negligently issued a statement of opinion or must the plaintiff show that the defendant knew or should have known that the statement of opinion was objectively false? In 1976, prior to the 1991 Supreme Court opinion in Virginia Bankshares, the Third Circuit held that a plaintiff need not show scienter to succeed on a claim brought against directors of a corporation under section 14(a) for issuing false statements of fact. See Gould, 535 F.2d at 778 Rather, the court found that under section 14(a) "a standard of due diligence as opposed to actual knowledge or gross negligence is quite appropriate." Id. In 1988, the Third Circuit explicitly extended that standard to statements of fact by financial advisors reasoning, "since an investment banker rendering a fairness opinion in connection with a leveraged buyout knows full well that it will be used to solicit shareholder approval ... we see no convincing reason for not holding it to the same standard of liability as the management it is assisting." See Herskowitz, 857 F.2d at 190. Further, the Third Circuit stated "a material misrepresentation even when made negligently rather than intentionally or recklessly, can still inflict the anticipated harm, and is thus deemed actionable." Id. at 190.
In Virginia Bankshares, however, the Supreme Court seems to have created a more stringent standard as applied to statements of opinion. In finding that a statement of opinion must be subjectively false, the Supreme Court appears to protect defendants from liability for negligently made statements of opinion. In light of this, the District of Connecticut concluded, "the subjective prong may be satisfied by allegations of recklessness: a plaintiff's allegations do not need to rise to the level of intentional deception." Freedman, 958 F.Supp. at 753. This court agrees with the District of Connecticut and finds that to succeed on a section 14(a) claim based on a statement of opinion, a plaintiff must show more than that the defendants negligently made a statement, the plaintiff must demonstrate that the defendants recklessly or intentionally issued an objectively false statement.
For purposes of the subjective analysis, the court will assume that the statements of opinion are objectively false (that is, the value of the exchanged assets was not equal). To prove that these statements were subjectively false the plaintiffs must show that, at a minimum, the Financial Advisors made their statements in reckless disregard as to whether they were false. In turn, that question requires the court to determine whether it was reasonable for the Financial Advisors to rely on *516 the financial statements and other information provided by CTFG. That is, did the Financial Advisors actually rely on the information provided by CTFG and, if so, was that reckless?
First, the plaintiffs have not identified facts that suggest and no reasonable juror could conclude that the Financial Advisors did not actually rely on the financial statements and information provided by CTFG. Second, no genuine issues of material fact exist about whether the Financial Advisors' reliance was reckless. The Financial Advisors disclosed that they planned to rely on the financial information provided by CTFG to reach their conclusion. Further, plaintiffs have not identified facts to suggest that the Financial Advisors reliance was reckless. As the Financial Advisors argued, they did not contract to reaudit CTFG's or RAC's financial statements and projections. Rather, CTFG asked the Financial Advisors to make a judgment based on a limited set of data. The court finds that no reasonable juror could conclude that the Financial Advisors recklessly ignored other information, including plaintiff's so-called red flags, in forming their opinion. Further, given the novelty of the subprime finance industry, the Financial Advisors had few benchmarks against which to compare the growth of RAC or the specifics of its loan portfolio. Thus, no reasonable juror could find that the Financial Advisors' statements were subjectively false.
Therefore, the court will grant the Financial Advisors' motions for summary judgment that they did not recklessly breach duties to the shareholders in issuing their fairness opinions.

3. Was the Proxy Statement an "essential link" in the split-off transaction?

Barlow, Race, Firestone, Mangano, Griffith, Pearl, ABN AMRO, Sandler O'Neill and KPMG argue that plaintiffs cannot establish that the allegedly false or misleading Proxy Statement was an essential link in causing the challenged corporate action. Defendants claim that plaintiffs cannot establish a causal link because the votes of the outstanding shareholders were not necessary to approve the split-off transaction. An affirmative vote of a majority of CTFG's shareholders was required for approval of the split-off transaction. As disclosed in the Proxy Statement, members of the Taylor family beneficially owned 25% of CTFG's outstanding stock, members of the Cole Family beneficially owned 25% of the stock, and the other executive officers and directors of the company collectively held 4.7% of the stock. In the Proxy Statement, the Taylor Family, Cole Family, and the executive officers and directors indicated their intent to vote for the split-off transaction. Defendants argue that because a majority of the shareholders expressed their intention to approve the transaction, any misstatements or omissions contained in the Proxy Statement could not have impacted the outcome of the vote or caused harm to plaintiffs. See Virginia Bankshares, Inc., 501 U.S. at 1083, 111 S.Ct. 2749 (finding no causal link between material misstatements in a proxy statement and the plaintiffs' alleged damages where a parent corporation, owning 85% of the outstanding stock of a subsidiary, issues the proxy statement before a shareholder vote on the parent's plan to acquire the remaining 15% stock in a freeze out merger).
Plaintiffs argue that the defendants miscast the argument. According to plaintiffs, the crux of the issue in the present case is whether the proxy vote was essential to the consummation of the split-off transaction. According to plaintiffs, but for the misleading representations in the *517 Proxy Statement, members of the Cole Family would not have voted for the split-off transaction at the 1996 annual meeting. In support of their allegations, plaintiffs rely on admissions from a lawsuit the Coles filed against the Taylors on August 19, 1998 in the Court of Chancery of the State of Delaware, Cole v. Taylor, No. CA 16594 (Del.Ct.Ch.1998). In that suit, the Coles alleged that the Taylors and other defendants breached their fiduciary duty to the Coles by failing to disclose material information to them in conjunction with the split-off transaction.
Defendants made a similar argument in support of their motions to dismiss. In denying those motions the court stated:
It is unclear whether plaintiffs will be able to establish adequate facts through discovery to show that the Coles were misled into supporting the transaction and that they would have withdrawn their support of the transaction if they knew the full extent of its risks. The court notes that it is possible, especially in light of [Cole v. Taylor], that the votes the Coles had previously committed to approving the transaction were a product of the alleged fraud.
In re Reliance Sec. Litig., 91 F.Supp.2d at 730. The court reasoned that if plaintiffs allegations are correct, this case is "distinct from Virginia Bankshares, as there is a question of fact as to whether, absent the alleged fraud, a majority of the Company's officers and directors would have committed their shares to approval of the split-off transaction." Id.
Defendants contend that after adequate time for discovery plaintiffs have not identified facts to support their theory of causation. Plaintiffs counter arguing that the Coles' judicial admissions in the complaint of Cole v. Taylor are sufficient to overcome a motion for summary judgment. See Williams v. Union Carbide Corp., 790 F.2d 552, 556 (6th Cir.1986) (finding that a party's pleading in one case may be used as an evidentiary admission in another litigation); E.M. v. A.M., 455 A.2d 866, 869 (1983); John Strong, McCormick on Evidence ง 257 (5th ed.1999).
Although the court is sympathetic to plaintiffs argument, Virginia Bankshares appears to foreclose this line of reasoning. In Virginia Bankshares, the Supreme Court considered whether an allegedly false statement of opinion in proxy materials could be the essential link to a minority shareholder's harm if the minority votes were not required by law or corporate bylaw to authorize the transaction giving rise to the claim. See Virginia Bankshares, Inc., 501 U.S. at 1098, 111 S.Ct. 2749. There, the court found that a minority shareholder could not establish causation for her damages when a parent company controlled 85% of the outstanding voting shares of a subsidiary corporation. This decision apparently establishes a bright line rule that courts should not look behind an affirmative shareholder vote where a majority of the shareholders indicate in the proxy statement that they will vote in a certain manner. See Virginia Bankshares, Inc. 501 U.S. at 1105-06, 111 S.Ct. 2749. That is, a court should not undo a corporate decision requiring shareholder approval in which controlling shareholders indicate their intent to cast an affirmative vote in the face of speculative claims that, absent some statement in the proxy materials, a controlling shareholder would have voted differently.
Here, plaintiffs have not identified facts from which a reasonable juror could conclude that absent statements in the proxy materials, the Coles would have voted against the transaction. The facts appear to show that the Coles were in favor of the transaction because of RAC's growth potential and profitability. Although the *518 proxy statement reflects RAC's expected growth, plaintiffs have not shown that but for these statements, the Coles would have voted differently. Therefore, the court will grant defendants' motion for summary judgment on plaintiffs' claims based on section 14(a) of the Exchange Act.

C. Motions for Summary Judgment Under Section 20(a)

Congress enacted section 20(a) of the Exchange Act to impose secondary liability on individuals who exercise control over a primary violator of the securities laws. See Rochez Bros. v. Rhoades, 527 F.2d 880, 889 (3d Cir.1975). The statute states:
Every person who, directly, or indirectly, controls any person liable under any provision of this Act or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to whom any controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. ง 78t(a). The Securities and Exchange Commission defined control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." 17 C.F.R. ง 240.12b-2(f).
To determine whether an individual is a controlling person, "courts have given heavy consideration to the power or potential to influence and control the activities of a person, as opposed to the actual exercise thereof." Rochez Bros., 527 F.2d at 891. Stated differently, plaintiffs must show that defendants exercised control over the accused operations, but need not show that defendants exercised control over the specifically accused transaction or activity. See Donohoe v. Consolidated Operating & Production Corp., 30 F.3d 907, 911-912 (7th Cir.1994). To establish liability under the statute, however, a plaintiff must show more than control. The plaintiff must show that the defendant participated in the fraud or furthered the fraud through inaction. See Rochez Bros., 527 172d at 891; Brug v. The Enstar Group, Inc., 755 F.Supp. 1247, 1256-57 (D.Del. 1991). Inaction alone cannot be the basis of liability; defendants' inaction must be deliberate and done intentionally to further the fraud. See Rochez Bros., 527 F.2d at 891.
Lori Cole, Irwin Cole, Race, Firestone, Mangano, and Griffith all contend that plaintiffs cannot establish that they were control persons or that they culpably participated in the fraud. Defendants contend that even if they are control persons, they acted in good faith and are thus exempted from liability under the statute.
The Cole family owned 25% of CTFG's outstanding stock. Irwin Cole founded CTFG and remained active in the management of the company until his stroke in 1995. Both Irwin and Lori Cole served as directors of CTFG. This is sufficient to defeat a motion for summary judgment as to whether Lori and Irwin Cole are control persons under the statute. See Rochez Bros., 527 172d at 891 (noting favorably that the Sixth Circuit found "a director of a company who, with his family, heavily invested in that company" was a controlling person) (citing Mader v. Armel, 461 F.2d 1123, 1125, 1126 (6th Cir.1972)). The outside directors, Race, Firestone, Mangnano, and Griffith, served on subcommittees related to the oversight of CTFG's accounting and reporting practices. These duties are sufficient to raise genuine issues of material fact regarding the control status of these defendants.
*519 Defendants contend that even if they are control persons, plaintiffs cannot show that they participated in the fraud. Plaintiffs contend that the facts that they identified in support of their claim that defendants negligently or recklessly performed their duties raise genuine issues about whether defendants culpably participated in the fraud. The court agrees. Although plaintiffs have not identified facts that show that defendants intentionally perpetrated a fraud on the public, a reasonable juror could conclude that defendants culpably participated in the fraud by approving the allegedly misleading SEC documents.
Lastly, defendants contend that they are entitled to a summary judgment on the statutory affirmative defense that they acted in good faith. Plaintiffs have identified facts which may support a finding that defendants acted negligently or recklessly in performing their duties of oversight as directors of CTFG. In light of these facts, the court cannot find as a matter of law that defendants performed their duties in good faith.
Therefore, the court will deny defendants' motions for summary judgment on the claim based on section 20(a) of the Exchange Act.

D. Motions for Summary Judgment On Breaches of Fiduciary Duties Owed the Shareholders

1. The Coles and the outside directors

Plaintiffs contend that defendants breached their "fiduciary duty under Delaware law to disclose all material facts necessary for a reasonable shareholder to make an informed decision with respect to the split-off." That is, according to plaintiffs, by failing to inform shareholders that RAC had inadequate loss reserves, defendants breached their fiduciary duty to disclose material information that shareholders needed to vote on the split-off transaction.
Defendants argue that they are immune from such liability. According to defendants, CTFG's corporate charter includes an exculpatory clause releasing its directors from liability under certain claims brought by the corporation or its stockholders. Article XII, Paragraph B of the charter provides in part:
B. Elimination of Certain Liability of Directors: No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, as the same exists or hereafter may be amended, or (iv) for any transaction from which the director derived an improper personal benefit.
See also 8 Del.C. ง 102(b)(7) (authorizing Delaware corporations to include exculpatory clauses in their charters). Although the exculpatory clause does not release directors from liability for claims based on breaches of the duty of loyalty or for intentional misconduct done in bad faith, the clause shields directors from liability for claims based on a breach of the duty of care made in good faith. See O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 914 (Del.Ch.1999) (citing Emerald Partners v. Berlin, 726 A.2d 1215, 1224 (Del. 1999)).
It is settled law in Delaware that the disclosure obligation "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material obligations *520 within the board's control when it seeks shareholder action." Stroud v. Grace, 606 A.2d 75, 84 (1992). This duty arises from a combination of a director's "fiduciary duties of care, loyalty, and good faith." Malone v. Brincat, 722 A.2d 5, 11 (1998). Thus, to determine whether the exculpatory clause shields the director defendants the court must decide whether the plaintiffs complaint alleges a breach of the duty of care or a breach of the duty of loyalty.
A claim for breach of the fiduciary duty of disclosure only implicates the duty of care when the allegations suggest the violation was made as a result of a good faith, but erroneous judgment about the proper scope or content of the required disclosure. Where the allegations support the inference that the directors knowingly or intentionally failed to disclose, however, the violation implicates the duty of loyalty.[7]See O'Reilly, 745 A.2d at 915.
In the court's opinion on the motions to dismiss, the court stated:
Plaintiffs have averred sufficient circumstantial evidence to permit the inference that one or more defendants may have knowingly withheld material information from the [CTFG's] shareholders. Such conduct may rise to a violation of the directors' duty of loyalty to the [CTFG's] shareholders, and thus would not warrant immunity under the exculpatory clause of the [CTFG's] corporate charter.
In re Reliance Sec. Litig., 91 F.Supp.2d at 732.
After taking discovery, plaintiffs have not identified facts to support their allegation that defendants acted intentionally or with knowledge. At most, plaintiffs have identified facts which suggest that the Coles and the outside directors may have recklessly approved certain SEC documents. Further, plaintiffs have not identified facts that demonstrate that defendants breached their duty to disclose in bad faith. Therefore, the court finds that Lori Cole, Irwin Cole, Race, Firestone, Mangano, Griffith, and Pearl are entitled to summary judgment on the plaintiffs' claim that defendants breached their fiduciary duty to disclose material information necessary for shareholders to make informed decisions.

2. Alstrin, Pearl, and the Taylor defendants

Sidney Taylor, Jeffrey Taylor, Bruce Taylor, Alstrin, and Pearl moved for summary judgment that they cannot be sued by both the shareholder plaintiffs in a class action and the company via the estate representative for the same breach, involving the same claim, the same harm, and the same damages. These defendants contend that the class action plaintiffs do not have standing to bring this claim.
Under Delaware law, directors of a company owe distinct duties to both shareholders of the corporation and the corporation as an entity. For instance, the directors of a company owe a duty of disclosure to the shareholders. See Arnold v. Society for Savings Bancorp, Inc., 650 A.2d 1270, 1275 (Del.1994). That duty "inheres any time a corporate board of directors seeks stockholder action." Zirn *521 v. VLI Corp., 681 A.2d 1050, 1056 (Del. 1996). A claims that alleges a breach of the duty to disclose belongs to the shareholders and may be brought as a class action lawsuit. In contrast, a claim that alleges a breach of a duty to a corporation may be brought as a derivative claim or, as in this case, a claim by the estate representative.
Defendants may be concerned about the potential for double recovery, (in other words, that the defendants will have to pay the same damages to both the shareholder class and the estate representative). However, that is a question of the appropriate measure of damages and does not implicate the standing of plaintiffs to bring a claim for a breach of a fiduciary duty. Therefore, the court will deny defendants' motion for summary judgment that plaintiffs cannot bring a claim for a breach of the duty to disclose.

III. CONCLUSION

For the reasons stated above, the court grants Dolph's motion for summary judgment that he did not violate section 10(b) of the Exchange Act The court will grant defendants' motion for summary judgment that Barlow, Race, Firestone, Mangano, Griffith, Pearl, Sandler O'Neill, ABN AMRO, and KPMG did not violate section 14(a) of the Exchange Act. Lastly, the court will grant defendants' motion for summary judgment that Irwin Cole, Lori Cole, Race, Firestone, Mangano, Griffith, and Pearl did not breach their fiduciary duty under Delaware state law to disclose material information. The court denies the remainder of the motions for summary judgment.
The court will enter an order consistent with this opinion.
NOTES
[1] Although Cole Taylor Financial Group amended its Certificate of Incorporation to change its name to Reliance Acceptance Group after the close of the split-off transaction, throughout this Opinion, the court will refer the company as CTFG.
[2] Fed.R.Civ.P. 23 provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties fairly and adequately protect the interests of the class.
[3] 28 U.S.C. ง 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.
[4] 28 U.S.C. ง 1407 provides in pertinent part:

(a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: Provided, however, that the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded.
[5] Irwin Cole died after the original complaint was filed. The consolidated amended complaint names Shirley Cole, Lori Cole, and Cathy Cole Williams as executors of Irwin Cole's estate. Shirley Cole, Lori Cole, and Cathy Cole Williams, in their capacity as executors of Irwin Cole's estate, are collectively referred to as "Irwin Cole."
[6] On December 22, 2000, pursuant to a stipulation among the parties, the Court entered an order dismissing plaintiffs' claim against Pearl based on section 20(a).
[7] Delaware law distinguishes between the duty of care and the duty of loyalty. See Krim v. ProNet, Inc., 744 A.2d 523, 527-28 (Del.Ch. 1999). To show a breach of the duty of care, plaintiffs must overcome the presumption, known as the business judgment rule, that the defendant directors have acted on an informed basis and in the honest belief they acted in the best interest of the corporation. See Krim, 744 A.2d 523, 527-28. A breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain. Solash v. Telex Corp., 1988 WL 3587, at *7-8 (Del.Ch. Jan. 19, 1988).